May it please the court, counsel? My name is David Ochoa, and I represented the appellant below, and the first thing I must do to this court is apologize. On page 11 of my brief, I stated that United States Rodriguez, that was, I stated in there that I got it turned around with Gonzalez-Riveras to the 168 pounds and the father and son, and I apologize for that. The law is correct, but I twisted the factual basis. Now, that said, the issue that I believe that I have, I have the burden to show that in this case, the district court was clearly erroneous in making the conclusions that it did, and I think I have met that burden. And I think what we have to do is revisit the testimony of Agent Phillips. In my brief, I have already stated a number of things of why I believe his testimony is unworthy of belief. I would like to at this point discuss some other things that I believe show that his testimony is unworthy. But that's a hard burden. It's a very hard burden, Your Honor. It's a very hard burden, but I think I have met it because you have to look at his testimony in light of common sense and human experience. And it's not the only time, because the judge ruled on a safety issue, but that issue never came up during his direct examination. In fact, he testified that he, from his experience, knows the importance of putting everything that's important in his reports. But that never came out until I asked him on cross-examination that he never impeded the investigation of my client. He said no. He said it was a safety issue. It's not much, but it's still something. Then. Mr. Ochoa, let me see if I understand your argument correctly. Agent Phillips testified twice, once at the suppression hearing and once at trial. That's correct, Your Honor. And are you asking us to overturn Judge Bolton's factual finding at the suppression hearing based upon what you say is impeaching testimony from his later trial testimony? No. I think what I've also brought out at the trial, I brought out Agent Callahan, because Phillips has said it was a safety issue. I brought Callahan to specifically testify that it was not a safety issue. Now, the government said that while he wasn't paying attention. So you are asking us to look at the testimony at the subsequent trial. Also, yes. And to compare it with the testimony at the suppression hearing in order to declare that Judge Bolton's factual finding at the conclusion of the suppression hearing is clearly erroneous. Am I understanding your argument correctly? Well, I don't think you have to go that far. I brought that out. That's what I hear you arguing. And if that's your argument, can you give me a case that says that that's what we're supposed to do in reviewing a factual determination at a suppression hearing? Well, Judge, I use that to support, but I can just turn to the motion to suppress. But either we can consider it or we can't. And my question is, give me a case that says I can. Because this is the first time I've ever heard an argument like this. Well, then I must apologize. I can't. Okay. Okay. Well, did you move again for suppression? I sure did, Your Honor. At trial. At trial. I then moved to suppress. And again, the court denied it. Okay. Okay. Now, the other thing that showed that. Was that motion based on what? On an inconsistency? Well, at that time, I also brought to the judge's attention that Phillip's testimony was impeached or inconsistent with the safety issue based on Callahan's testimony. Now, the other thing. And the judge's ruling was. No, she didn't say. She just said it's denied. She didn't give a factual reason or an explanation like she did the first time. She just flatly denied it. The other thing that I think I've already made a quick reference to. The government says that Callahan wasn't really paying attention to say that it wasn't a safety issue. But I suggest to you that as an officer, if he would have thought that my client was causing or imposing the safety issue, he would have taken reasonable steps. However, because I want to leave some time. I believe the most critical testimony that impeaches Officer Callahan. And you can't get around this. Here is an officer with 10 years experience. That impeaches Callahan or impeaches Phillips? Phillips. Okay. Impeaches Phillips. Here's an officer of 10 years experience. Five years as an immigration officer whose job is to detect illegal aliens and drugs. And here is a man who himself is married to a Hispanic born in Mexico. Testified under oath that he could not tell the difference between a black man and a Mexican. Later on, he says, I could not tell whether Bravo Cuevas was Hispanic. And then a couple pages later on redirect, he testifies when asked how many of those people that were standing there as bystanders were Hispanic. And he said, I couldn't tell it. I didn't see anyone that wasn't. Another thing, it's a small issue. But the court itself turned to Agent Phillips and saying, are you saying that all those 60 to 90 people there, there were that many people there at night? And he said, yeah. She was even surprised by that testimony. Another thing which is, it's small, but it goes to show his inconsistencies. He said that I missed the point of the OK. So I thought there were vendors on the street who were selling food to the neighborhood. Yeah. So what's your point? The judge itself found that if the judge were surprised, then the judge would have bought your argument and granted your motion. Well, so, I mean, you're kind of putting, you know, the judge's actions don't support what you're saying. The other thing, Your Honor. Well, what is help? Help me. What is the precise finding that what is the finding that you say is clearly erroneous? So we can set it up for your adversary and then you can respond. The thing that I am saying is this, that his testimony, that the only reason that he stopped the bravo quietness was a safety issue. I am suggesting that common sense and human experience says that that is not the reason because it was never really a safety issue. You had these other officers that were there for that very specific purpose. The only reason that he approached that man because it was the color of his skin and because he believed of his ancestry that he was Hispanic. And that is the reason that he stopped. Let's assume for a moment that we agree with you that it was a racial profile stop. Okay. We have a finding by the district court that he was not in custody. And we have Supreme Court authority that says it is not illegal for police officers to engage people in conversation when they are not in custody on that type of a street type stop. How do we grant you relief in the face of that case? White and Terry said there is nothing in the Constitution that says that you can approach a person in the street and ask them questions. And as long as that person is free to walk away, there is no problem. And the district court found it was. But Terry, excuse me, Your Honor, in Brignone-Ponce, the court said not only as to cars, but as to people, too. You cannot stop a person. Do it on a racial basis. On immigration basis, if that is the basis. So you have to make that distinction that what White stated in Terry and what the court said in Brignone-Ponce. And this took place where? This took place in Yuma, Arizona on 8th Street. Okay. So I'd like to reserve the rest of my time if I may. You have about a minute. Thank you. May it please the Court, my name is John Lopez. I represent the United States in this matter. I'd like to address the issue head on. The government submits that this case, the stop involved in this case involving Agent Phillips was not based upon race. The record is clear and uncontroverted with respect to the events which gave rise to this conduct or contact. The defendant, Agent Phillips, and Agent Callahan all testified consistently that there was a car accident in the middle of a busy roadway. There was a law enforcement perimeter set around the accident scene. That there were no crosswalks or pedestrian crossing anywhere near the scene. That there were a number of individuals standing on the side of the roadway. And that the defendant, for some reason unknown to anyone, decided to walk directly through or very near the accident scene. And it was at that point that Agent Phillips contacted the defendant, and he called out to him in English twice, simply inquiring about why he was walking through this accident scene through a police perimeter. Did this occur at the time that the wrecker was hooking up one of the cars? Is that what the safety concern was? That's correct, Your Honor. Agent Phillips testified that the wrecker had either just hooked up the vehicle or was about to and was going to be moving, and that the defendant had walked in the proximity of the wrecker, and that's why he contacted him. Again, importantly, he addressed the defendant twice in English. I would submit to the court that I'd suggest that Agent Phillips assumed that he was a U.S. citizen or perhaps spoke English only when the defendant did not respond to his question. Did he address him in Spanish? Agent Phillips testified that as he took a couple of steps toward the defendant, the defendant claimed that he made a couple of steps toward Agent Phillips, that Agent Phillips at that point was able to assess the situation, he was able to get a full look at the defendant, and he testified that the defendant's manner of dress gave him an indication that this individual was perhaps from Mexico, and he described his pants, that they were essentially tattered, did not fit properly, they were dirty, and that he was wearing a pair of shoes which were made of tire tread, which in his training and experience are very commonly worn in Mexico. And again, this encounter, according to Agent Phillips, occurred within two and a half miles of the border, and the government submits that the initial contact was the result of the defendant's decision to violate a clearly demarcated police perimeter. Agent Phillips contacted him, assessed him in his manner of dress, and when the defendant didn't respond in English, it was another factor that perhaps led him to believe that perhaps the defendant was in the United States illegally. Was the perimeter established through marked police vehicles, or had they actually laid flares out or cordoned the area off with tape or something? Your Honor, the Agent Phillips testimony, and I believe Agent Callahan's testimony, and in fact the defendant's testimony, indicated that the perimeter was demarcated with police vehicles with lights flashing. This incident occurred at night at approximately 9 or 9.30 p.m. It was dark, and the accident was ringed or blocked off by several police vehicles with lights flashing. With respect to Deputy Callahan's testimony, Deputy Callahan testified that in his opinion, he didn't believe that the defendant had presented a safety issue. However, he did not refute the fact that the defendant walked in or near the accident scene and thus had differentiated himself from everyone else at the scene who apparently were Hispanic. And with respect to Agent Callahan's opinion that the defendant did not present a safety risk at the scene of the accident, Deputy Callahan conceded that he was preoccupied with his duties to investigate the accident, and in fact he was filling out paperwork at the time, and although he could testify that the defendant did walk nearby, he was not paying attention to what the defendant was doing. What do you think about co-counsel's argument to use Deputy Callahan's testimony to impeach, is it Agent Phillips or whatever, Callahan to impeach Phillips? Is that permissible? Or even if you consider that the court considered it after the court's finding, does that erode the court's finding? Your Honor, I would submit that it does not erode the court's finding because— But we can consider it as he suggested? Your Honor, I would submit that if anything, it simply demonstrates that there was a difference of opinion, a reasonable difference of opinion between two law enforcement officers about the significance or relevance of the defendant's conduct. So is that a factual issue that the court resolved? I believe implicitly the court resolved that. Because again, Your Honor, I would submit that Deputy Callahan's admission that he was not paying close attention to what the defendant was doing further diminishes any impeachment value that his testimony may have. But even to the extent that the court wishes to consider it impeachment value, for its impeachment value, it, I would submit, is simply a difference of opinion, a reasonable difference of opinion between two law enforcement officers who happened to be at the scene in which the defendant walked through the accident scene. So do you concede that because Mr. Ochoa renewed his suppression motion at trial and the court again denied it, that we may look at the testimony both at the suppression hearing and at the trial in order to determine whether Judge Bolton was clearly erroneous in her factual findings? Your Honor, I think that's both reasonable procedurally and in terms of the merits of the claim. So the answer is yes? Yes, Your Honor. But it doesn't change the result? That's correct, Your Honor. That's the government's position for the reasons stated, that it would not change the result. Now, with respect to whether Agent Phillips' contact with the defendant was a consensual encounter, the government submits that it was. The record is clear through the testimony of the defendant and Agent Phillips that the defendant answered Agent Phillips' questions freely and voluntarily, that the defendant admitted that at no point did he attempt to end the conversation. He did not attempt to walk away, that he was not handcuffed or otherwise restrained, and therefore this was a consensual encounter. It occurred in public in plain view of scores of other people, and the defendant at no point through his own testimony did he ever even suggest that he was not free to walk away, much less did he attempt to walk away. And it was based upon his admissions freely and voluntarily, given that Agent Phillips decided to arrest him for violating or committing illegal reentry, or in fact illegal entry at that point, because there was nothing known about the defendant's background. Okay. I don't believe there are any questions. Thank you, counsel. Thank you. Two points I'd like to make. The first one is as far as the tow truck, the ‑‑ I believe my client had already passed, and the agent went up to him and he didn't want him to come back because he thought it would be a, quote, a safety risk, yet he testified that there were people on the east side of the roadway, in the roadway, which would have been in the tow truck. So that's one issue I want to ‑‑ as far as consensual, the cases that were cited by the government, Kim, Mendenhall, Royal, Rover, all these cases, there's one thing that the officers did not approach any of these defendants with the first question. Where were you born? The only time you ever ask that question, where were you born, is at the border or the border equivalent. In this case, if he presented a safety hazard, why do you approach him and say, where were you born, not just say, listen, you're presenting a safety hazard, please leave the area. But when you ask somebody, where were you born, and are you in this country illegally, that shows in his state of mind. What did the officer testify that he said to your client in English, to which your client made no response? He said, I believe he said, where are you going? So the first thing he said to your client was not where were you born. It was a question you'd expect a police officer working an accident to say to someone who just walked through the middle of the accident scene. He was not working an accident. He was not working. He was assisting with translation. With translation, and the translation was already done. While Deputy Callahan was completing his accident report. All right. Okay. Thank you, Your Honor. Thank you, Your Honor. The case just argued is submitted for decision. We'll hear the next case, which is United States v. Bynum.
judges: Schroeder, Tallman, Callahan